J-A11023-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: E.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| APPEAL OF: S.B., MOTHER | |
| | No. 2577 EDA 2021 |

Appeal from the Decree Entered November 15, 2021
In the Court of Common Pleas of Lehigh County
Orphans' Court at No.: A2021-0055

BEFORE:  BOWES, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY STABILE, J.:　　　　　　　　　**FILED JUNE 16, 2022**

Appellant S.B. ("Mother") appeals from the decree entered on November 15, 2021 in the Court of Common Pleas of Lehigh County ("orphans' court"), that terminated involuntarily her parental rights to her son, E.H. ("Child"), born in March 2017.  Upon review, we affirm.

We glean the facts and procedural history of this case from the certified record.  Briefly, Lehigh County Office of Children and Youth Services ("CYS") assumed emergency custody of Child by removing him from Mother's care following an incident that occurred on October 5, 2019, when the Allentown Police Department responded to a call and found Child, then two years old, without any supervision at 11:00 a.m. in a downtown street with a pit bull terrier.  Child appeared dirty, was without shoes, wore a soiled diaper that was hanging off his body, and had lacerations on the bottom of his feet.  An

inspection of Child's home, located approximately one block from where Child was found, revealed that it was in a deplorable condition and not suitable for habitation. The home was dirty and foul-smelling with canine and/or human feces covering carpets. The feces, in various stages of decomposition, also were smeared on walls and floorings throughout the house. Flies were observed throughout the home. Additionally, narcotics were found in a pill bottle on the floor by Child's highchair and there was drug paraphernalia throughout the home. Mother claimed that she had left Child with a babysitter named Amber and blamed Amber and the dog for the deplorable condition of the house and Amber for Child leaving the same without supervision. Allentown Police Department never were able to confirm the identity of or locate Amber.

Eventually, almost two years later, on August 19, 2021, CYS filed the instant petition to terminate involuntarily Mother's parental rights to Child under 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8).[1] The orphans' court appointed Francis G. Sonne, Esquire, as guardian *ad litem* for Child. On October 14, 2021, the orphans' court held a hearing on the termination petition at which CYS and Mother presented testimony.

First, CYS called to the stand Kayla Szatkowski, a caseworker who had been employed by CYS for five years. N.T., Hearing, 10/14/21, at 15. Ms.

---

[1] CYS also petitioned to terminate involuntarily C.H., Jr.'s ("Father") parental rights to Child, but Father voluntarily relinquished them. N.T., Hearing, 10/14/21, at 10-14.

Szatkowski testified that she became involved in this case when she received a call from Allentown Police Department around 12:30 p.m. on Saturday, October 5, 2019, stating that they had "found a child and dog alone along the side of the road." *Id.* at 16. She recalled that the police believed the child to be around the age of two, but could not locate his mother at that time. *Id.* Ms. Szatkowski testified that when she arrived at Child's familial home, the police was talking to Mother. *Id.* According to Ms. Szatkowski, Mother informed her that Mother had left Child with a babysitter and that the babysitter and the dog must have destroyed the house. *Id.* Describing the condition of the house, Ms. Szatkowski stated that the home was "filled with rotting garbage and a very large amount of feces. Drugs. Drug paraphernalia. And prescription medication was all over the floor." *Id.* at 17-18. She opined that the feces looked like it "was there for at least a couple weeks." *Id.* at 18. Ms. Szatkowski remarked that "[i]t was the worst – the worst living conditions I have ever seen working with [CYS]." *Id.* She recalled that when the police opened the bathroom door, "they initially thought there was a decomposing body in the bathroom." *Id.* She described the smell as "something that's just indescribable." *Id.* Ms. Szatkowski testified that there were "piles and piles of feces" in the bathroom. *Id.*

Furthermore, she testified that the home was filled with debris and garbage and that many flies were just swarming the garbage. *Id.* at 18-19. She observed clear "drug baggies" with "white substance in the bags." *Id.* at

- 3 -

19.  She also observed a bottle of pills—with pills on the floor next to it—found within reach of Child.  *Id.* at 29.  According to Ms. Szatkowski,

> [t]here was food all over the counter, like, pots, and – in the one picture, there's a spatula with, like, caked-on, like, spaghetti sauce, and there's a drug bag right next to it.  Drug bags going up the stairs.  And on the floor, there was pills lying on the floor.  Smushed feces into the carpet.  In the bathroom, in the sink, there's garbage and feces surrounding the toiled.  In the shower.  All over the floor.  There's just piles and piles of feces.

*Id.* at 19.  She opined that the food had been left on the countertop for a long time, as it was caked on.  *Id.* at 20.  Ms. Szatkowski emphasized that the "smell is like something I've never experienced in my life."  *Id.*  After inspecting the home, Ms. Szatkowski recalled speaking to Mother again.  *Id.* She described her interaction with Mother as follows:

> It was very flat.  She was just more so, like, aggressive that we were there, me and the police.  She had said that she had a babysitter that had left Child the night before.  She said that she left that night.  That her paramour had – no.  That she had gone for a couple of hours, and her paramour had picked her up.  And the babysitter and the dog must have destroyed the place, because it wasn't like that when she left.

*Id.*  Ms. Szatkowski recalled that Mother had provided to the police the babysitter's name, an approximate address and phone number.  *Id.* at 21. However, upon investigation, the police determined that the babysitter did not exist.  *Id.*  She further recalled that Mother informed her that, based on the babysitter's social media post, "someday showed up [to the house] with a gun" and "[the babysitter] got scared and left."  *Id.*  As a result, the babysitter failed to notify anyone that the babysitter had to leave Child unattended and

- 4 -

alone at the house. *Id.* Ms. Szatkowski clarified that according to Mother, the babysitter left the house "because somebody came to the door with a gun." *Id.* at 21-22.

Ms. Szatkowski further testified that, contrary to Mother's statement that the dog was chained up in the basement, the dog was found with Child outside when the police responded to the call. *Id.* The dog was protecting Child, nudging Child away from the street. *Id.*

Ms. Szatkowski testified that when she was at the house, Mother was in the company of her paramour who had accompanied her to the scene. *Id.* at 22. Ms. Szatkowski recalled that she and the police interviewed Mother and her paramour separately. Mother informed her that she had been dating her paramour for several months and that the paramour had been to the house before, where he saw the babysitter. *Id.* The paramour, however, contradicted Mother's statement. He stated that he had been dating Mother for only a couple of weeks and that "he would pick [Mother] up at night and she would spend nights at his house." *Id.* The paramour denied ever entering the house or meeting the babysitter. *Id.* at 22-23. Ms. Szatkowski testified that when she asked the paramour whether Child was in the care of a babysitter the previous night, the paramour appeared "very upset," "looked down, and answered "no, ma'am, there was not." *Id.* at 23.

Ms. Szatkowski further testified that Child was transported to a hospital and that CYS obtained emergency custody of Child. *Id.* at 24. Child was placed in foster care at in a Diakon foster home. *Id.* Ms. Szatkowski testified

that after her initial encounter with Mother, Mother left her several threatening messages. *Id.* Mother accused Ms. Szatkowski of lying, informed her that she had found Ms. Szatkowski's social media, and that the Federal Bureau of Investigation ("FBI") was going to be coming after her. *Id.*

On October 7, 2019, Ms. Szatkowski attended a shelter care hearing at which Mother also was present. *Id.* at 25. Ms. Szatkowski testified that her involvement in this case terminated after the shelter care hearing and that Janel Herman was assigned to the case. *Id.*

On cross-examination, Ms. Szatkowski explained that Mother's demeanor was flat on the day of the incident after learning that Child would be removed from her custody. *Id.* at 27. She explained that

> I've been involved so many times with having to remove children, and parents are very emotional understandably. [Mother] was not. She was just, well, this is not my fault. Somebody was here, and they just left my child she said. And just blaming everybody else. She didn't ask where [Child] was. Then she just said, well, can I at least have my dog? And the conversation ended.

*Id.* Ms. Szatkowski stated that Child appeared healthy and nourished when she visited him at the hospital on October 5, 2019. *Id.* at 28.

CYS next called to the stand Janel Herman who was assigned to the CYS Child Protection Service ("CPS") investigations. *Id.* at 31. Ms. Herman testified that she became involved in this case on October 7, 2019 on the day of the shelter care hearing. Ms. Herman recalled that because of the October 5, 2019 incident, a CPS investigation and a separate General Protection Services ("GPS") investigation was initiated against Mother. *Id.* at 32. Ms.

Herman stated that she performed both of those investigations and prepared the resulting reports. *Id.* Describing the investigations, she testified:

> The [CPS] investigation was for serious physical neglect of a child; egregious, repeated, or prolonged failure to supervise. The [GPS] was for inadequate housing, inadequate basic needs, substance abuse and . . . inadequate shelter. Conduct by parent that places the child at risk or fails to protect the child from others.

*Id.* at 33. Ms. Herman testified that her task was to investigate Mother because Child was found on the street wandering with the dog when nobody was at the familial home, which was in a deplorable condition. *Id.* at 33-34. She testified that her first contact with Mother was at the October 7 shelter care hearing when CYS referred Mother to Averhealth for drug testing. *Id.* at 34-36. According to Ms. Herman, "[Mother] minimized the event, stating that it was a babysitter. She blamed [Ms.] Szatkowski, the caseworker, for lying." *Id.* at 36.

The next day, on October 8, 2019, Ms. Herman visited Mother at the house at 8:30 a.m. *Id.* at 37. Mother was aware of this visit as Ms. Herman had told her about it the day before at the shelter care hearing. *Id.* at 37-38. When Ms. Herman asked Mother about what happened on October 5, Mother explained that "she left [Child] with the babysitter and that she thinks the babysitter may have started using again." *Id.* at 38. Mother identified the babysitter as "Amber Rodriguez" ("Amber"). *Id.* Ms. Herman testified that during the investigations, she attempted but failed to verify Amber's existence. *Id.* Despite scouring social media and following leads, Ms. Herman

and the police were unable to verify the identity of Amber. *Id.* at 38-39. Ms. Herman then testified that something unusual happened during the October 8 home visit. *Id.* at 39.

> [Mother] received a call from a blocked number. When the phone rang, she basically said, Oh, who's calling me from a blocked number? She answered the phone on speaker. The guy asked for Amber. And [Mother] said wait, who is this? And he said this is Luis. He reported that he was Amber's cousin. He said he was looking for Amber, because Amber had called him the day before stating that she left [Child] home alone in the house and trashed the house and that she had started using again. He said that he did not know where Amber was. That he didn't keep normal contact with Amber. That she just made the phone call. So he was basically trying to find her. [Mother] and Luis went back and forth a couple times. And at that point, I explained to her that she could – she could make the call later. That we needed to finish our home visit. And that I could not verify the validity of that call.

*Id.* at 39-40. Ms. Herman testified that she questioned the "legitimacy" of the phone call and whether the person on the other end was even named Luis. *Id.* at 40. Ms. Herman added that Luis

> basically reiterated everything that [Mother] said, you know, in a nutshell. I left the home trashed. She told me she left [Child] there alone with the dog. She may have relapsed. We can't find her. I didn't have any contact with her prior to this phone call. I'm concerned. So it just basically – everything that basically came out of his mouth was what [Mother] was alleging happened.

*Id.* Given the timing and nature of the phone call, Ms. Herman concluded that it was "staged." *Id.* at 41.

Ms. Herman described the condition of Mother's home as "very unsanitary." *Id.*

It appeared as though the garbage was picked up. Possibl[y] some cleaning. But the home still had an odor to it. . . . When I left, . . . the odor was in my clothes. There were flies. They were kind of . . . just randomly flying around. The floors were not cleaned. So there was no feces piles. They were picked up. But you could tell that the rug was still saturated. Dirty. It had stains. The hardwood had just like filth that kind of builds up on it. Black . . . stuff that probably could have been scraped off. I would say the bathroom – the tub was no longer or the shower was no longer black. . . . . [T]he clutter appeared and the amount of feces that was described, that was picked up.

*Id.* at 42. Ms. Herman testified that the home as it appeared during the visit was not suitable for a two-year-old child. *Id.* at 43. She recalled that she explained to Mother what steps needed to be taken to clean and sanitize the home. *Id.* at 44. Ms. Herman further recalled that Mother reiterated throughout the visit that Mother was going to contact the FBI and Project Innocence because CYS "takes Latin babies and takes them to white families." *Id.* at 45. Following the visit, Ms. Herman referred Mother for services, including protective parenting and made arrangements for Mother to start visits with Child. *Id.*

On October 16, 2019, Mother began in-person supervised visits with Child. *Id.* at 48. The visits were held weekly and Mother "was provided transportation to and from along with the supervision." *Id.* Child was referred to "early intervention, developmental, pediatric, and pediatric hematology and oncology" services and treatment. *Id.* at 49, 60-61.

On October 24, 2019, both the CPS and GPS investigations were concluded. The result of the CPS investigation was an "indicated" status for

Mother, for causing serious physical neglect to Child by repeated, prolonged, or egregious failure to supervise. *Id.* at 47; Petitioner's Ex. 3-6. The GPS investigation also was determined to be valid based on a lack of supervision of Child and the condition of the home and Child. *Id.* at 47; Petitioner's Ex. 3-14. Both reports noted the conflicting stories Mother provided about what occurred at the home, who was watching Child and where the alleged babysitter was. As a result of the October 5, 2019, incident, Mother was charged with endangering the welfare of children ("EWOC") under Section 4304(a)(1) of the Crimes Code, 18 Pa.C.S.A. § 4304(a)(1). On June 17, 2020, Mother entered into a negotiated a guilty plea to EWOC and was sentenced to 18 months' probation. *Id.* at 49, Petitioner's Ex. P7-52. Relatedly, Ms. Herman testified that Mother had multiple criminal convictions on her record. *Id.* at 50-51.

According to Ms. Herman, the court conducted an adjudication hearing on November 19, 2019, following which Child was adjudicated dependent by stipulation of parties. *Id.* at 51-52. Ms. Herman recalled that Father was granted legal and physical custody of Child under an order of protective services. *Id.* at 52. At the adjudication hearing, the court recommended that Mother "maintain stable income and housing and cooperation with [CYS]." *Id.* at 52. Mother further was advised by CYS and later ordered by court to submit to a protective parenting evaluation and follow any resulting recommendations. *Id.* at 52-53. Ms. Herman recalled that Mother was referred to Justice Works for reunification services. *Id.* at 53.

On cross-examination, Ms. Herman explained that Mother could not provide a telephone number for Luis as Luis had called her from a blocked number. *Id.* at 56. She acknowledged that Mother had warned her that Child would be in danger with Father whom she believed to be involved with the Latin Kings and under investigation by the drug task force. *Id.* at 58. According to Ms. Herman, CYS was unable to verify Mother's allegations against Father. *Id.* at 59. Ms. Herman stated that while she was involved in this case, "there were no concerns" with Child being in Father's care. *Id.*

CYS next presented the testimony of Amanda Scheitrum, a supervisor for CYS' GPS unit. *Id.* at 65. Ms. Scheitrum testified that she became involved in this case in January 2020. She recalled that on January 20, 2021 Father left Child with his paternal niece, L.P., and did not return. *Id.* at 65-66. As a result, CYS sought and obtained custody of Child. *Id.* at 66. CYS thereafter placed Child with L.P. as a kinship resource. *Id.*

Ms. Scheitrum testified that Mother attended the first permanency review hearing, which took place on March 10, 2020. *Id.* at 67. From the time Ms. Scheitrum became involved in this case until the March 10 hearing, Mother was engaging the services provided by Justice Works. *Id.* Mother was attending weekly visits with Child that were supervised by Justice Works at Comfort Cottage and completed an intake for protective parenting evaluation on February 25, 2020. *Id.* at 67-68. Ms. Scheitrum testified that, during this time period, Mother resided at the same house as she did on October 5, 2019 and that, despite repeated requests, Mother failed to allow her access to the

home to conduct a walk-through inspection. *Id.* at 68-69. According to Ms. Scheitrum, one of the reasons she wanted to perform a walk-through was to move the weekly visits to Mother's home. *Id.* at 68. In denying Ms. Scheitrum's requests for a home visit, Mother furnished various excuses. *Id.* "[T]he most repeated answer I had received from her were that there were boxes packed up everywhere because she was looking for new housing and there was no place to sit. There were no toys." *Id.* As a result, as of the time of the March 10 permanency review hearing, Ms. Scheitrum was unable to observe the condition of Mother's home. *Id.* at 69.

When asked whether Mother was employed from January to March of 2020, Ms. Scheitrum answered that initially Mother's mother was supporting her and that around February 2020, Mother obtained a job at 7-Eleven. *Id.* Mother provided pay stubs to Ms. Scheitrum. *Id.* at 70. Mother also was receiving mental health treatment at Haven House. *Id.* At the conclusion of the March 10 permanency review hearing, the court determined that Mother made minimal progress and needed to obtain and maintain stable, appropriate housing and legal income. *Id.* at 71. Mother also was directed to attend the protective parenting evaluation. *Id.* at 71-72. Child was ordered to remain in L.P.'s care. *Id.* at 72.

Ms. Scheitrum recalled that the next permanency review hearing was held on August 25, 2020 with Mother present. *Id.* She testified that from March to August 2020, Mother communicated with her daily and cooperated with reunification services. *Id.* at 72-73. Mother continued to attend visits,

which were held weekly, but moved to Zoom during some time periods because of the COVID-19 pandemic. *Id.* at 73-74.

Ms. Scheitrum further testified that Mother declined to allow her an opportunity to observe the condition of the home. *Id.* at 74. Mother "gave the excuses of having boxes everywhere and there was no place for a visit to take place." *Id.* Ms. Scheitrum recalled that Mother was looking for other housing and that she "was struggling due to the pandemic and the limited availability of options within her budget." *Id.* Mother was employed from March to August 2020. *Id.* at 74-75. Following Mother's completion of the protective parenting evaluation, she began treatment as Forensic Treatment Services ("FTS"). *Id.* at 73, 75.

Finally, Ms. Scheitrum recalled that, on June 17, 2020, Mother entered a negotiated guilty plea to EWOC and sentenced to 18 months' probation. *Id.* at 75. As a result of her sentence, Mother was required to provide urinalysis for drug testing. *Id.* at 76. Ms. Scheitrum testified that at the August 25 review hearing, it was determined that Mother's compliance with the permanency plan was moderate and her progress toward alleviating the circumstances that necessitated the original placement was minimal. *Id.* at 76-77.

The next permanency hearing was conducted on February 9, 2021, which Mother failed to attend. *Id.* at 77. Ms. Scheitrum testified that Mother's contact with her decreased from August 2020 to February 2021. *Id.* Ms. Scheitrum recalled that Mother blamed CYS for her problems and thought that

"people were out to get her or it was someone else's fault and people didn't do their job." *Id.* at 79. Mother was discharged from FTS on January 15, 2021. *Id.* at 79-80. Mother continued to attend the weekly visits with Child. *Id.* at 80. According to Ms. Scheitrum, Mother continued to reside at the same house—wherefrom Child was removed at the start of this case—from August 2020 until February 2021. *Id.* at 81. Mother continued to deny access to Ms. Scheitrum to observe the condition of the home. *Id.* Ms. Scheitrum recalled that "[t]here was a specific time when I showed up unannounced, and we ended up standing outside for an hour and a half, and that was when she said the landlord was there fixing the pipe and I couldn't go in." *Id.* Ms. Scheitrum never got to see the inside of Mother's house. *Id.* at 82. Ms. Scheitrum stated that from the time of the adjudication until February 2021—a period of approximately 14 months—Mother was searching for a new home. *Id.* at 91. From August 2020 until February 2021, Mother changed employments, but failed to furnish proof of her new employment to Ms. Scheitrum. *Id.* at 82. Mother continued to attend mental health treatment with Haven House during relevant review periods in the dependency matter. *Id.* at 75, 83.

With respect to urinalysis, Ms. Scheitrum recalled that Mother submitted a total of two samples from August 2020 to February 2021. *Id.* at 84. Additionally, she refused to submit a urinalysis once and was a no-show nine times. *Id.* at 84-85. Following the February 9 hearing, it was determined that Mother's compliance with the permanency plan was minimal and that she made "no progress" towards alleviating the circumstances that necessitated

the original placement. *Id.* at 85. Ms. Scheitrum's involvement in this case terminated at the end of February 2021. *Id.* Child remained with L.P. from January 2020 until February 2021. *Id.* at 89. According to Ms. Scheitrum, Child had developed a bond with her kinship provider who met Child's daily needs. *Id.* at 97. Ms. Scheitrum explained:

> [Child] definitely has a bond with the parents, but especially with [L,P.'s] children. He looks to [L.P.'s] son as a brother. He – I believe that he did call [L.P.'s] husband Father – Dad. And occasionally [L.P.] – Mom. So they're – just proof of that he felt safe and comfortable enough to call them Mom and Dad, and then their son like a brother of his own.

*Id.*

CYS then called Ms. Laura Craig to the stand. *Id.* at 98. Ms. Craig testified that she had been a caseworker with CYS for six and a half years and became involved in this case on March 1, 2021. *Id.* at 99. She stated that she was familiar with the events of this case that occurred prior to her involvement. *Id.* Ms. Craig recalled that she attended a permanency review hearing on August 10, 2021. *Id.* at 100. She further recalled that during her time on this case and during the permanency review period, Mother was cooperating minimally with the reunification services (Justice Works). *Id.* Ms. Craig explained that, while Mother was participating in the supervised visits, the provider felt that "they were doing a lot of the work as far as looking for housing." *Id.* According to Ms. Craig, Mother reported in March 2021 that she was in the process of relocating from her residence and that she no longer resided there. *Id.* at 106, 108. Mother advised Ms. Craig that she was living

with a friend. *Id.* at 108. Mother, however, advised Ms. Craig to continue to send mail to the house (from which Child was removed) and that her landlord would pass along the mail to her. *Id.* at 106. Mother failed to share with or disclose to Ms. Craig or Justice Works her new address. *Id.* at 107. As a result, Ms. Craig was unable to observe the conditions of Mother's home. *Id.* Since March 2021, Ms. Craig asked Mother two to three times for permission to visit her home. *Id.* at 108.

Ms. Craig testified that, when she was assigned to this case, Mother already had been discharged from FTS. *Id.* at 100. Mother, however, was given an opportunity to re-enroll in FTS. *Id.* at 101. In this regard, Mother was advised to pick up an intake packet for protective treatment with FTS. *Id.* Mother failed to pick up the packet until a month later. *Id.* Mother returned the completed packet in early July 2021, nearly three months later. *Id.* at 101-02.

Mother attended visits with Child. *Id.* at 102. Ms. Craig testified that Mother advised her that she was working for two employers and that, despite being asked to provide proof in March 2021, she failed to do so until August 2021. *Id.* at 104-05. Ms. Craig also testified that Mother continued to receive mental health treatments at Haven House. *Id.* at 107. When Ms. Craig was assigned to this case, Mother still was required to attend urine screens. *Id.* at 110. Ms. Craig testified that Mother was a no-show for her urinalysis appointments at Averhealth, but that in March 2021 she did test positive for

THC following a drug test administered to Mother at the Office for Probation. *Id.* at 110, 127-28.

According to Ms. Craig, Mother continued to send threatening texts, sometimes fifteen times in a row, stating that (1) she would not stop until Ms. Craig was in jail or fired, (2) CYS was corrupt, and (3) she was working with the FBI. *Id.* at 111-12. Ms. Craig testified that CYS scheduled a meeting on June 10, 2021 to address Mother's texts and that Mother "ended up leaving the room in the middle of the meeting" because she was unhappy with the conversation. *Id.* at 112-13.

Ms. Craig testified that, during her time on this case, she became aware that Mother had five other biological children in Berks County. *Id.* at 113. Mother informed Ms. Craig that Mother had acted as "a surrogate for another woman, and that they were not her children." *Id.* at 113-14. According to Ms. Craig, Mother's story about the five other children was convoluted and very hard to follow. *Id.* at 114. Mother claimed that Berks County CYS "was corrupt, and that, as a result, she involuntarily terminated her parental rights to one of the children. *Id.* Ms. Craig testified that, following the permanency hearing, it was determined that aggravated circumstances existed with respect to Mother because she involuntarily terminated her parental rights to another child in Berks County. *Id.* at 116. It was further determined that Mother's compliance with the permanency plan was minimal and that she made "no progress" towards alleviating the circumstances that necessitated the original placement. *Id.* at 116-17.

On October 5, 2021, a status review hearing was conducted to address concerns regarding visitation between Mother and Child. *Id.* at 117-18. Justice Works refused to transport Mother to and from the scheduled visits, citing safety concerns because of Mother's aggressive text messages to a Justice Works caseworker. *Id.* at 117. Ms. Craig recalled that Mother's text messages were triggered when Justice Works declined to accommodate Mother's repeated last-minute changes—made shortly before the visits—to pick-up locations. *Id.* Justice Works caseworker who transported Mother to visits stated at the hearing that Mother "had such a high stench of marijuana that she would have to drive with her windows down." *Id.* at 122. Following the hearing, the court moved Mother's visits to the Lehigh County Government Center and Mother became responsible for her own transportation. *Id.* at 118.

Ms. Craig testified that Child is doing really well in placement with L.P. *Id.* at 118-119. Child is receiving biweekly play therapy and physical therapy relating to his step when he walks. *Id.* at 119. Ms. Craig testified that she visits Child every month in placement. *Id.* She further testified that the kinship provider (L.P.) was married and had three children—16, 13 and 11— at home. *Id.* Two of the three children are boys and all three children get along with Child "like siblings." *Id.* at 120. Describing Child's relationship with the foster family, Ms. Craig testified:

> They are very close. They have a good bond. When I took over, [Child] was very shy since I was a new caseworker coming onto the case; and he would go to kinship providers for safety and to

hide behind, just like normal children do. He calls them Mom and Dad. He's very close to them. They are always going on family activities. And during COVID, they got creative and would do family activities in the home. And they are always doing something with him.

*Id.* at 120-21.

Ms. Craig noted that Child had been with the same kinship provider since January 2020. *Id.* at 121. She opined that Child shared a bond with kinship providers, who attend to his needs and take him to appointments. *Id.* Moreover, Ms. Craig testified that Child did not have a bond with Mother because

[h]e has been with the kinship since he was two. It's really all he knows at this point, and he seems [Mother] weekly at the Comfort Cottage. There's been reports that when [Mother] gets upset, that she doesn't take it out on [Child]; but as a child he can sense when she's upset, and those are the nights that he goes back to the kinship home and he wets the bed or he takes a little bit more time to adjust back to their family. He – he views his kinship providers as his family. They're the ones providing all his needs.

*Id.* at 121-22. Ms. Craig testified that a Justice Works caseworker informed her that Mother was "all over the place during the visits. That even though they were an hour, she was not focusing on [Child]; she was focusing on blaming everyone else in the situation and what everyone else is or is not doing." *Id.* at 122.

Ms. Craig testified that, should Mother's parental rights be terminated, L.P. would step forward as an adoptive resource. *Id.* at 123. Ms. Craig opined that Mother's parental rights to Child should be extinguished because she failed to assume any responsibility for whatever has occurred since the start

of this case. *Id.* Critically, according to Ms. Craig, CYS has been unable to observe the condition of Mother's home since October 2019. *Id.* Mother also continues to exhibit unstable behavior through her repeated text messages, and still has not completed her protective services treatment with FTS per the recommendations of the protective parenting assessment. *Id.* at 121-29.

Next, Le Shan St. Clair took the stand for CYS. *Id.* at 134. Ms. St. Clair testified that she was a supervisor for Justice Works. *Id.* at 135. She stated that Mother needed assistance with reunification and, as a result, she needed to focus on housing, mental health and employment. *Id.* at 138-39. Ms. St. Clair noted that Justice Works had to terminate transportation services for Mother when Mother sent aggressive texts messages to a caseworker. *Id.* at 141. Ms. St. Clair recalled that during the June 10 meeting with Mother and Ms. Craig, Mother terminated the meeting when pressed for certain documentations. *Id.* at 144-52.

CYS next presented the testimony of Ms. Olivia Bobyak, a family resource specialist at Justice Works who supervises visits for parents. N.T., Hearing, 10/15/21, at 6. She transported Mother and supervised a total of four visits in this case. *Id.* at 7. Ms. Bobyak testified that Mother refused to share her address with her, even though Ms. Bobyak transported her to and from visits. *Id.* at 10-11. She further recalled that on two separate occasions when she picked up Mother for the weekly visits, Mother emanated a heavy "odor of marijuana." *Id.* at 12. Ms. Bobyak recalled that she informed Ms. Craig of those two instances when Mother "would get in my vehicle, she would

aggressively rub her nose and rub her eyes along with the stench of marijuana." ***Id.*** at 13. Ms. Bobyak recalled her observations of Mother's interactions with Child during the four supervised visits. ***Id.*** at 17. Although Mother and Child were happy to see each other during the visit, Child would become nervous and tense when the kinship provider drove away from the visit. ***Id.*** at 17-19. Ms. Bobyak opined that the relationship between Mother and Child existed only during the visit and "I don't think that bond goes further than their 60 minutes a week together." ***Id.*** at 19.

Lastly, CYS called to the stand Dr. Aaron Myers, Psy.D., who has been employed for the past six years at FTS at Valliere & Counseling Associates. ***Id.*** at 25-26. Dr. Myers testified that he performed Mother's psychological evaluation in this case. ***Id.*** at 28-29. He recalled that he evaluated "her parenting abilities, protective capacities, her violence risks, her mental health, and to identify recommendations." ***Id.*** at 29-30. In the process, Dr. Myers met with Mother, reviewed relevant case materials and communicated with Ms. Scheitrum. ***Id.*** at 30-32.

Dr. Myers testified that Mother discussed with him the details surrounding the October 5, 2019 incident following which Child was removed from her custody. ***Id.*** at 32. Dr. Myers recalled:

> During the interview, she discussed how she was allowing her son to be babysat by a woman by the name of Amber Rodriguez. She discussed the history of their relationship and how they met. She also described how [Amber] was regularly babysitting [Child]. . . . On the day of the specific incident, she then elaborated on how she was at work and was also doing her laundry, and while she was there she received a text message from her landlord that

- 21 -

police were at her home. So then she came to the house. She explained that she was in regular communication with [Amber] thinking that everything was fine, but then upon her arrival to the house, she described that [Amber] had left and there were some concerns about her using substances in the home.

*Id.* at 32-33. According to Dr. Myers, Mother stated that Amber "went around the corner and went to go smoke. She forgot to lock the door. When she saw the police, she left." *Id.* at 34. Dr. Myers testified that Mother did not say anything about an ex-boyfriend or guns during the interview. *Id.* While Mother shared her mental health conditions with Dr. Myers, she "generally minimized her substance use and drinking" and denied using any "marijuana" or "any other substance." *Id.* at 36. Dr. Myers specifically recalled that Mother denied "ever trying" marijuana. *Id.* When confronted by Dr. Myers about a previous guilty plea for possession of marijuana, Mother explained that "she was holding her ex-paramour's marijuana. It wasn't actually for her." *Id.* at 36-37. Dr. Myers testified that Mother generally did not accept responsibility for many of her previous criminal convictions. *Id.* at 37. Dr. Myers noted Mother's tendencies for violence based on her criminal history. *Id.* at 37-39.

With respect to the condition of Mother's home on the day of the incident, Dr. Myers testified:

During the interview, she discussed how prior to her leaving her home, that the conditions were not like what were found in the home which contradicted what the background information that I received. . . . She made it seem like [she left] earlier that day. That this baby – that [Amber] had arrived at the home to take care of [Child] that day when [Mother] left for work and then gone to do her laundry.

- 22 -

*Id.* at 40. Dr. Myers noted that Mother's description contradicted the police and CYS account of the condition of her home on October 5. *Id.*

Dr. Myers recalled that Mother seemed "disingenuous" at times during the interview. *Id.* at 41. He explained that she was "generally presenting herself in a positive light and minimizing her role in the situation." *Id.* Additionally, according to Dr. Myers' testimony, Mother seemed "paranoid at times, afraid about sharing more information about herself and thinking that [CYS] would use any information against her if she were to share more." *Id.*

Dr. Myers clarified that he performed the following psychological testing of Mother: The Millon Clinical Multiaxial Inventory ("MCMI"), the Child Abuse Potential Inventory ("CAPI"); the Parent-Child Relationship Inventory ("PCRI"), and the Parental Stress Index ("PSI"). *Id.* at 41. Dr. Myers explained that the MCMI "is a measure that focuses a lot on the presence of symptoms of personality disorders and other clinical syndromes that are described in the diagnostic manual for the field." *Id.* MCMI also assists in describing "moral or characterological issues that an individual has." *Id.* The MCMI results revealed that Mother "presented herself in an extremely positive light, likely concealing aspects of her psychological or interpersonal difficulties." *Id.* at 42. The test further revealed that Mother suffers from social anxiety and distrust and tends to project her undesirable traits onto other people. *Id.*

With regard to the CAPI, Dr. Myers explained that the test is "another screening inventory for the detection of some of the characteristics for known

physical child abusers." ***Id.*** at 43. The CAPI for Mother produced an "invalid" result because "she was placing herself in such a favorable light that it exceeded the minimum cutoff score for the Faking Good Index, which basically means she presented herself in such a positive light that her results couldn't be interpreted." ***Id.***

Dr. Myers further described the PCRI as another "general measure that looks at parent's attitudes toward their own parenting and toward their children." ***Id.*** at 45. That test did produce a valid profile for Mother. ***Id.*** Dr. Myers, however, testified that Mother has a tendency to infantilize Child and may struggle to accept his appropriate signs of independence. ***Id.*** Dr. Myers opined that, as Child gets older, Mother "may have trouble adjusting to him being able to take on more responsibilities himself." ***Id.***

Finally, Dr. Myers described the PSI as a "parenting measure that looks specifically at four different domains." ***Id.*** One domain is focused on the child and different aspects of the child and the parent's perception of their child. ***Id.*** at 45-46. "Then there's the parenting domain, where it focuses more on factors that contribute to parenting. And then, finally, there's a general life stress domain that describes other factors, maybe outside factors that could still influence the parent/child relationship." ***Id.*** at 46. According to Dr. Myers, Mother produced a valid profile on this test. ***Id.***

Next, Dr. Myers explained why Mother failed to yield any insight into her situation. ***Id.***

Generally, she had a tendency to minimize the problems in her life. She didn't take responsibility for most of the criminal charges that we reviewed and found some way to minimize those. And also going back to what I said about her presenting herself in a positive light, it made it difficult to really assess what her problems were because she just presented with what she thought I would want to hear rather than describing the actual problems that were going on. She wouldn't even admit to the conditions of her home, which were obviously pretty bad. So that had me pretty concerned.

*Id.* at 47. Dr. Myers found Mother's lack of willingness to be honest most concerning. *Id.*

Based on his evaluation of Mother, Dr. Myers opined that Mother "should not be a primary caretaker for [Child] at the time." *Id.* at 48-49. Dr. Myers recommended that Mother submit to a polygraph test to gain more information about the October 5 incident. *Id.* Finally, Dr. Myers recommended that Mother undergo treatment to address her parenting abilities and protective capacities, history of victimization and certain personality characteristics. *Id.* at 50. Mother was referred to FTS for the aforementioned treatment. *Id.* at 51. Mother began treatment with FTS on July 9, 2020 and was discharged therefrom in January 2021 because of repeated issues with video attendance, including her reported technical issues and her tendency to inappropriately attend therapy sessions via video conferencing in public places. *Id.* at 65-66.

In response, Mother testified on her own behalf. *Id.* at 69. In pertinent part, she attributed the condition of her home on October 5 on Amber, stating for the first time that she no longer was living in the home at the time of the

- 25 -

incident, and instead had turned the house over to Amber who had been residing there. *Id.* at 100—08. According to Mother, she was residing at her then-boyfriend's apartment at the time of the October 5 incident. *Id.* at 111. When questioned why she was at the house where she no longer was residing when Ms. Herman made a home visit, Mother testified that she told CYS "I wasn't staying there." *Id.* at 114. When questioned why, prior to Ms. Herman's visit, she spent five hours cleaning the house where Amber allegedly was living, Mother answered because Amber "took off" and the landlord forced Mother to clean up the place or he would be pressing charges. *Id.* Mother testified that the lease to the house was in Amber's name on October 5. *Id.* at 115. Also, during her testimony, Mother provided new explanations as to how she knew Amber and those new explanations contradicted the information previously provided to CYS. *Id.* at 120-136.

Mother testified that she failed to provide CYS with her current address because she feared that Father, who physically assaulted and abused her in the past, would find out her address. *Id.* at 76-78. When asked where she currently was residing, she stated that she was residing in a domestic violence shelter, and could not provide the address. *Id.* at 148-49. When asked why she had not told CYS that she was residing in a domestic violence shelter before the termination hearing date, Mother claimed that she had told a CYS caseworker, but could not explain why neither CYS nor Justice Works was aware of her living situation. *Id.* at 148-50.

Mother also testified that she had never smoked marijuana until recently when she obtained a medical marijuana card. Mother, however, was unable to provide a medical marijuana card, or a copy of the same, to the court and advised that the card was at her home 45 minutes away. *Id.* at 139-44.

On the third day of the hearing, Mother's testimony continued, but she still failed to produce a medical marijuana card. N.T. Hearing, 11/12/21, at 8-17. In the midst of her testimony, while being questioned about where she had lived during the past two years, Mother requested a break, then left the hearing and did not return. *Id.* at 13-17.

Following the hearing, on November 15, 2021, the orphans' court granted CYS's petition to terminate involuntarily Mother's parental rights under Section 2511(a)(8). Mother timely appealed. Both Mother and the orphans' court complied with Pa.R.A.P. 1925.

On appeal, Mother presents two issues for our review.

[I.] Did the trial court err as a matter of law and/or abuse its discretion in finding that [CYS] met the requirements of 23 Pa.C.S.A. § 2511(a)(8) by clear and convincing evidence?

[II.] Did the trial court err as a matter of law and/or abuse its discretion in finding that [CYS] sustained their burden of proof by clear and convincing evidence that the termination of biological parents parental rights to [Child] best meet the needs and welfare of [Child] as required by 23 Pa.C.S.A. § 2511(b)?

Mother's Brief at 4 (unnecessary capitalization omitted) (sic).

We review Mother's claims in accordance with the following standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the [orphans'] court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The [orphans'] court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights to Child pursuant to subsection 2511(a)(8), and (b),[2] which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> > (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
> >
> > . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

We first consider whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(8):

---

[2] Generally, we need only agree with the court as to any one subsection of 2511(a), as well as subsection 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa. Super. 2003). It is important to note that Section 2511(a)(8) does not require consideration of a parent's willingness or ability to remedy the conditions that led to the removal of his or her child. *In re Adoption of R.J.S.*, 901 A.2d 502, 511 (Pa. Super. 2006). In addition, this Court defines what constitutes the relevant conditions somewhat broadly. We have held, for example, that a parent failed to remedy the conditions that led to her child's placement when the placement resulted primarily from the parent's positive drug test for cocaine and the parent was later incarcerated for drug offenses. *See In re C.L.G.*, 956 A.2d 999, 1006 (Pa. Super. 2008) (*en banc*) ("Mother's conviction and subsequent term of incarceration derives directly from her 'drug issues,' it is a part of the original reasons for the removal of C.L.G. from Mother's care and forms a basis for the termination of Mother's parental rights pursuant to Section 2511(a)(8).").

Here, it is undisputed that Child was removed from Mother's care for more than 12 months—almost two years in fact—prior to CYS's filing of the termination petition. Mother's Brief at 8. Mother, however, argues that the orphans' court abused its discretion in terminating her parental rights to Child because the court failed to consider the totality of her circumstances as set forth in her testimony. *Id.* at 8-16. Essentially, Mother attacks the orphans'

court's weight and credibility determinations regarding her failure to obtain suitable housing for Child.

Finding Mother's testimony to be incredible,[3] the orphans' court provided the following rationale for terminating Mother's parental rights.

> On October 5, 2019, Allentown police found two-year-old [Child], barefoot and dirty, toddling around downtown Allentown with a pit bull terrier who would nudge him from going into the street. Police took emergency custody of [Child], contacted [CYS], and tried to locate [Child's] parents. Mother was not at home but did arrive at the apartment after she learned the police were looking for her. Police and the responding [CYS] caseworker found the interior of the apartment to be filthy, vile, and manifestly unsanitary. The caseworker testified they were the worst conditions she has ever seen in her work with [CYS] over the past five years. A [CPS] investigation and a [GPS] investigation resulted in an "Indicated" status in which Mother was named as the perpetrator. On November 25, 2019, criminal charges were filed against Mother regarding the events of October 5, 2019. On June 19, 2020, Mother pled guilty to [EWOC] and was sentenced to 18 months of probation.
>
> [Child] was adjudicated dependent following a hearing on November 19, 2019. Since then, Mother has been court-ordered to comply with numerous requirements in order to safely reunite with [Child], one of which was to obtain and maintain appropriate housing. In the past two years, Mother has not demonstrated to [CYS] or any service provider that she has obtained suitable housing. [CYS] caseworkers and other service providers assigned to work with the family have not been able to evaluate Mother's current housing situation or even the stability of her housing situation because, over the past two years, she has refused to provide her address. At the hearing, she testified that she has kept her address secret from [CYS] and her service providers

---

[3] It is well-settled that the orphans' court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73–74 (Pa. Super. 2004). As a result, we are bound by the orphans' court's weight and credibility determinations.

because she is afraid they may inadvertently provide the address to [Father], at whose hands she has suffered domestic violence. While we do not dispute Mother's fear of Father, we do note that Mother's testimony lacked credibility throughout.

. . . .

One of the conditions that led to [Child's] removal from Mother's care was Mother's failure to provide him with safe and suitable housing. Nearly 24 months have passed from the date [Child] was removed from her care, and Mother still is unable to provide [Child] with safe and suitable housing. At this point, [Child] has been in the same stable kinship foster placement for 24 continuous months. He views his kinship caregivers as his parents and their biological children as his siblings, whereas his Mother is someone who visits him for one hour each week. Although he is excited to see Mother when she first arrives at a visit, he is visibly relieved when his kinship caregiver arrives to take him home. Termination will best serve [Child's] needs and welfare so that he can achieve permanency with a family that loves him, keeps him safe, and has already become one [of] their family members.

Orphans' Court Decree, 11/15/21 (sic).

After carful review, we conclude that the record supports the decision of the orphans' court to terminate Mother's parental rights pursuant to Section 2511(a)(8). As detailed above, Child was removed from Mother's care on October 5, 2019, after he was found wandering barefoot and dirty in downtown Allentown. By the time of the termination hearing, Child had remained in foster care for approximately twenty-four months, well beyond the twelve-month requirement of Section 2511(a)(8).

Moreover, serious concerns about Mother's housing were at the core of this case. It is thus clear that Mother had failed to remedy the conditions that led to Child's removal on October 5, 2019. As the record confirms, the primary

reason that Mother was unable to care of Child at the time of his removal was her lack of appropriate housing. Mother has remained without appropriate housing during the entirety of this case. Indeed, Mother failed and refused to demonstrate to CYS that she was able to obtain and maintain appropriate and stable housing for Child. As the orphans' court found: "her testimony about 72 emails from real estate databases such as Trulia and Zillow regarding her low credit score and extensive criminal background tended to indicate she still had not found suitable housing." Orphans' Court Opinion, 1/6/22, at 2.

The orphans' court reasoned:

Mother's stated reason for keeping her housing situation secret from [CYS] was that she fears [Father] because of their history of domestic violence. She explained she was afraid her address might be provided to [Father] because, in the past, a probation officer's inadvertent error had resulted in Father learning Mother's address. Yet Mother testified that if her son were living with her, she would give her address to [CYS] and would let them into her home. She also claimed in court that all she needed in order to provide [CYS] with her address was their assurance that [CYS] would not share the information with Father. The [c]ourt found Mother's testimony, and her explanations for failing to provide her address(es) to [CYS] to be incredible.

*Id.*

Finally, terminating Mother's parental rights will best serve Child's needs and welfare.[4] The record here confirms that Mother was regular in attending

---

[4] Both Section 2511(a)(8) and (b) require that a court considering termination of parental rights assess the needs and welfare of the subject child or children. However, the Section 2511(a)(8) needs and welfare analysis is distinct from the Section 2511(b) needs and welfare analysis, and courts must address each

*(Footnote Continued Next Page)*

weekly visits with Child. The weekly one-hour visits occurred over the course of two years because Mother failed to comply with the court-ordered requirement that she obtain and maintain safe and appropriate housing. As a result of her failures, Mother was unable to regain custody of Child. On the other hand, as detailed earlier, Child shares a strong bond with his foster parents with whom he has been residing for approximately two years. *See T.S.M.*, 71 A.3d at 268 ("Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents."). Unlike Mother, the foster parents have shown that they are capable of providing Child with safety, stability, and permanence. Moreover, they provide for Child's needs, and provide him the only home he knows. He shares a parent/child relationship with the foster parents and views their children as his siblings.

In sum, given that Mother failed to remedy the conditions that led to Child's removal and placement for over two years, and given that Child is thriving in foster care, it was within the discretion of the orphans' court to conclude that termination would best serve Child's needs and welfare. *See In re Adoption of C.D.R.*, 111 A.3d 1212, 1220 (Pa. Super. 2015) ("Clearly, it would not be in Child's best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent."). Thus, we

---

separately. *See C.L.G*., 956 A.2d at 1009 ("[W]hile both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the 'needs and welfare of the child,' . . . they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).").

affirm the decree terminating Mother's parental rights pursuant to Section 2511(a)(8).

We consider next whether the orphans' court abused its discretion by terminating Father's rights pursuant to subsection 2511(b). We adhere to the following analysis.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the [orphans'] court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the [orphans'] court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

**C.D.R.**, 111 A.3d at 1219 (quoting **In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted)). Furthermore, our Supreme Court has explained that "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." **T.S.M.**, 71 A.3d at 268. The Court directed that, in weighing the bond considerations

pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The **T.S.M.** Court observed that "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

For the reasons already discussed, the record supports the conclusion of the orphans' court that terminating Mother's parental rights will best serve the needs and welfare of Child pursuant to Section 2511(b). By the time of the hearing in this matter, Child had remained without parental care for over two years, during which Mother failed to remedy her lack of appropriate housing. Mother failed to obtain and maintain stable and appropriate housing and failed to discuss with CYS whatever safety concerns she had relative to Father discovering her address. While Child maintains a relationship with Mother, it is Child's foster parents who have shown that they are capable of providing the safety, stability, and permanence Child needs. As this Court has emphasized, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." **R.J.S.**, 901 A.2d at 513.

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by terminating Mother's parental rights to Child involuntarily. Therefore, we affirm the court's November 15, 2021 decree.

Decree affirmed.


*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 6/16/2022*